**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Iva L. McKEE, Defendant–Appellant.**

**No. 98–5413.**

United States Court of Appeals,
Sixth Circuit.

Argued: April 27, 1999.

Decided and Filed: Sept. 27, 1999.

Internal Revenue Service's ("IRS") investigation violated her constitutional rights, and (2) the IRS failed to comply with its own regulations during the course of its investigation against her. We affirm McKee's conviction, but not without reservations.

## I.

### A.

This case illustrates that the substantive distinction between an IRS civil audit and a criminal tax investigation is not always clear. As the district court put it in a manner reminiscent of the Watergate Hearings, the issues in this case are essentially: "(1) What did the IRS know about the McKees' individual and corporate tax affairs?; and (2) when did the IRS know it?" *See* J.A. at 420 n. 3 (Dist.Ct.Op.).

In a recent opinion involving similar issues as the case *sub judice*, the Seventh Circuit provided preliminary background to the structure of IRS tax investigations. *See United States v. Peters*, 153 F.3d 445, 447 (7th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 801, 142 L.Ed.2d 663 (1999). We find the Seventh Circuit's introductory explication helpful to the purposes of this case, and will repeat it here:

> The IRS splits the responsibility for enforcing the nation's tax laws between its two investigative divisions. The Criminal Investigative Division ("CID") is charged with investigating criminal violations of the tax code and related federal statutes. CID investigators are called "special agents." Like many other criminal law enforcement agents, they carry firearms and badges. In addition, special agents must recite an administrative warning prior to soliciting information from taxpayers. *See Beckwith v. United States*, 425 U.S. 341, 343, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976) (quoting warning provided by special agents).

> On the other hand, the Examination Division of the IRS is responsible for

Hugh B. Ward, Jr., Assistant U.S. Attorney (argued and briefed), Knoxville, Tennessee, for Plaintiff–Appellee.

Herbert S. Moncier (argued and briefed), Knoxville, Tennessee, for Defendant–Appellant.

Before: JONES, NELSON, and NORRIS, Circuit Judges.

NATHANIEL R. JONES, J., delivered the opinion of the court, in which ALAN E. NORRIS, J., joined. DAVID A. NELSON, J. (p. 545), delivered a separate concurring opinion, in which ALAN E. NORRIS, J., joined.

## OPINION

NATHANIEL R. JONES, Circuit Judge.

Defendant–Appellant Iva L. McKee appeals her conviction for tax fraud on the grounds that (1) the evidence against her should have been suppressed because the

conducting civil tax audits. Examination Division investigators are known as "revenue agents." In contrast to special agents, revenue agents do not carry firearms; nor are they required to provide taxpayers with an administrative warning. Although an Examination Division audit typically concludes with some sort of civil settlement between the IRS and the taxpayer, such an audit may uncover evidence that causes the revenue agent to refer the case to the CID for criminal investigation. Under IRS regulations, a revenue agent who uncovers a "firm indication of fraud on the part of the taxpayer" must immediately suspend her audit and refer the case to the CID. *See Internal Revenue Manual* § 4565.21(1). At that point, the CID enters the case and the IRS' efforts become focused on the possibility of criminal [prosecution]. *See generally* Michael I. Saltzman, *IRS Practice and Procedure* ¶¶ 12.01 & 12.03[1][a].

*Peters*, 153 F.3d at 447.

### B.

The facts underlying this appeal are generally not in dispute. McKee[1] and her husband William McKee were managers and shareholders of an electrical services company called Valley Electric, Inc., in Knoxville, Tennessee. For seven months in 1991, a woman named June Pique worked at Valley Electric as a bookkeeper.

In August 1992, Pique contacted IRS Revenue (*i.e.*, civil) Agent Dee Loges regarding possible tax violations on the part of the McKees. Most of the alleged improprieties involved the use of corporate funds for personal expenses, such as trips, household goods, and home utility bills. According to Pique, the McKees did not disclose this "additional" personal income on their income tax returns. Apparently, Pique had previously alerted Loges about violations in another unrelated tax investigation, and Loges believed Pique to be a credible source. Loges was informed later

that month by another anonymous source (although she knew the person's identity) that the McKees' personal expenses were being paid through Valley Electric in the form of vacations, electric bills, food, and household necessities.

Based on the information from both Pique and the anonymous source, Loges instituted a civil audit of the McKees in early September 1992. On September 2, 1992, Loges initiated contact with the McKees by sending them a letter requesting an appointment for an audit. The September 2, 1992 letter was a form letter setting forth the purposes of the audit. The letter informed the McKees of their right to have present an attorney, a certified public accountant, or any other representative of their choosing. The letter also states that "[a]n examination of such a taxpayer's return does not suggest a suspicion of dishonesty or criminal liability." J.A. at 40.

Loges also attached copies of two other documents which are routinely sent to the taxpayer when the IRS initiates a civil audit: (1) an IRS Publication 1, which is a form entitled "Your Rights as a Taxpayer"; and (2) an IRS Notice 609, the "Privacy Act Notice." The purpose of IRS Publication 1 is to inform the taxpayer of her rights and some of the basic procedures and policies associated with a civil audit, and allows for postponement of an audit if the taxpayer wishes to consult an attorney. J.A. at 47. The Privacy Act Notice informs the taxpayer of the IRS' legal right to ask for information, the reason the agency is asking for it ("to carry out the U.S. tax laws") and the consequences of failing to cooperate with the audit ("you may be charged penalties and, in certain cases, you may be subject to criminal prosecution"). J.A. at 42–43. Finally, the letter also included an attached standard Information Document Request for a corporate audit, requesting numerous corporate and accountant records. The

---

**1.** All references to "McKee" are to Defendant–Appellant Iva McKee.

letter and attached forms contained no indication that the audit had been prompted by Pique's or the anonymous informant's tips.

Loges met with William McKee on September 8, 1992. Loges inquired about a specific $23,800 loan from Valley Electric to the McKees, and Mr. McKee admitted that it was for personal work done on his home. He further explained that there was no formal loan document establishing an interest rate or setting forth a repayment plan because Valley Electric was a small company and did not conduct such formalities. Loges asked Mr. McKee if the company paid personal expenses for him, but he responded in the negative. The activities for which Loges questioned Mr. McKee at this meeting eventually became the basis for the later criminal prosecution against the McKees. The next day, Loges informed Mr. McKee that Valley Electric would be audited for the 1991 tax year.

Loges and Mr. McKee met again on September 24, 1992 in conjunction with the Valley Electric corporate audit. Loges questioned Mr. McKee about the company minute book, stock record book, and shareholder loan documents. Again, Mr. McKee responded that the company simply didn't keep such things. Loges and Mr. McKee met again the following day, and Loges found several checks and expenses that should have been, but were not, listed in Mr. McKee's corporate account or employee loan account.

Over the ensuing months, Loges continued to request additional records and documents from Valley Electric and discovered discrepancies pointing in the direction of possible tax violations, including at least two notes payable to the corporation that were dated March 5, 1990, and March 15, 1991, respectively. In her notes for the McKees' file, Loges expressed concern, if

not suspicion, that the notes looked "identical," and Loges theorized that one of the notes had been backdated. At times, Loges requested more specific information from the McKees, such as original documents instead of the provided copies.

Loges finally conducted the audit with McKee and her husband on February 17, 1993. Loges directed several questions regarding the discrepancies of Valley Electric's records at McKee, including why personal expenses did not get included in their shareholder/loan records. Loges also interviewed four or five Valley Electric employees in the course of her investigation. She did not have any contact with the CID during the civil investigation and audit.

Following the February 17, 1993 meeting, Loges terminated all contact with the McKees and determined that a criminal referral might be appropriate. After several levels of review by the IRS's Civil Division, the case was referred to the CID on May 5, 1993. The CID officially informed the McKees that they were under criminal investigation on November 9, 1993.

The case was transferred to the U.S. Department of Justice Tax Division for evaluation for criminal prosecution on March 11, 1996. On March 4, 1997, a federal grand jury in the Eastern District of Tennessee returned a two-count indictment charging the McKees with tax fraud under 26 U.S.C. § 7206(1) and 18 U.S.C. § 2. The case was assigned to a magistrate judge.

■ The McKees filed several pretrial motions, including a motion to suppress and for a *Kastigar* hearing,[2] which are bases of this appeal. After a hearing on the motion, the magistrate judge issued a lengthy report on September 26, 1997, recommending that the motion to suppress be

---

**2.** *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). The purpose of a *Kastigar* hearing is to determine if the government's evidence was obtained in violation of the defendant's Fifth Amendment rights. *See, e.g., United States v. Overmyer,* 899 F.2d 457, 460–62 (6th Cir.1990).

denied. Although the McKees filed objections to the magistrate's report, the district court adopted the recommendations of the magistrate judge in an opinion issued on February 9, 1998.

On February 13, 1998, the McKees filed a motion to dismiss for the IRS's failure to conduct the criminal investigation according to its own regulations. On February 17, 1998 (supplemented by an additional order the following day), the district court denied this motion as well. This issue is also before us on appeal.

McKee subsequently agreed to plead guilty, but reserved the right to appeal to this court. The charges against William McKee were dismissed. On March 3, 1998, the district court sentenced McKee to twelve months' probation.

This timely appeal followed.

## II.

■ In reviewing the district court's ruling on a defendant's motion to suppress, we will uphold the district court's factual findings unless they are clearly erroneous; however, we review the district court's conclusions of law *de novo. United States v. Dotson,* 49 F.3d 227, 229 (6th Cir.1995). A finding of fact is clearly erroneous when, although there is some evidence to support the finding, upon review, we are "left with the definite and firm conviction that a mistake has been committed." *United States v. Russell,* 156 F.3d 687, 690 (6th Cir.1998) (quotation and citation omitted).

## III.

### A.

McKee argues that her conviction is invalid for two reasons: (1) Loges should have turned the investigation over to the CID earlier than she actually did; and (2) Loges did not complete the "Form 2797" report in the course of her investigation. Both of these theories share the same underpinning-that Loges failed to comply with the relevant provisions contained in the IRS's *Internal Revenue Manual* (hereinafter "Manual"). Although neither McKee nor the government raises the point, we must initially address whether a taxpayer may properly base a challenge to a tax conviction on the IRS's alleged noncompliance with the procedures of its Manual.

■ At first glance, our precedent suggests not. *See Valen Mfg. Co. v. United States,* 90 F.3d 1190, 1194 (6th Cir.1996). In that case, the taxpayer argued that the assessments levied against him for delinquent filings were invalid because the Manual suggested that his conduct was excused. We rejected this argument as meritless, and noted that the "provisions of the [IRS's] manual ... only govern the internal affairs of the Internal Revenue Service. They do not have the force and effect of law." *Id.* (quotations and citations omitted). This rule is based on the view that the Manual was generally created for the agency's own internal administration, and not for the protection of taxpayers. *See, e.g., United States v. Mapp,* 561 F.2d 685, 690 (7th Cir.1977); *United States v. Lockyer,* 448 F.2d 417, 420–21 (10th Cir.1971). Additionally, this rule applies to both civil and criminal cases. *See United States v. Marra,* 481 F.2d 1196, 1204 (6th Cir.1973) (expressing doubt that internal IRS handbook guidelines affords substantive rights to taxpayers); *United States v. Tenzer,* 127 F.3d 222, 228 (2d Cir.1997) (internal IRS policy was not "directed to public nor publicized"), *cert. denied,* —— U.S. ——, 118 S.Ct. 1580, 140 L.Ed.2d 795 (1998); *United States v. Michaud,* 860 F.2d 495, 499 (1st Cir.1988) (Breyer, J.) ("the law is clear that an IRS agent's violation of a regulation ... does not prevent prosecution and conviction of a defendant, nor does it require suppression of evidence"); *Groder v. United States,* 816 F.2d 139, 142 (4th Cir.1987) (Manual provision "confers no substantive rights or privileges upon taxpayers").

However, we believe that the Manual's provisions are, at the very least, relevant

in determining whether a taxpayer's constitutional rights have been offended. In *United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979), the Supreme Court ruled that evidence obtained in violation of the Manual's provisions against recording interviews did not fall within the exclusionary rule because those particular violations of the Manual did not infringe on constitutional rights. *Id.* at 755–56, 99 S.Ct. 1465. *Caceres*, however, only rejected a *per se* rule that every violation of the Manual was tantamount to a due process violation. The Court did leave open the possibility that a federal court may enforce the Manual's provisions when "compliance with the [provision] is mandated by the Constitution or federal law." *Caceres*, 440 U.S. at 749, 99 S.Ct. 1465.

■ Several circuits adhere to the view that a conviction may be overturned if the IRS is found to have violated a provision in its Manual "designed to protect the constitutional rights of taxpayers." *United States v. Horne*, 714 F.2d 206, 207 (1st Cir.1983) (per curiam); *accord United States v. Leahey*, 434 F.2d 7, 10–11 (1st Cir.1970) (allowing due process claim where Special Agent failed to give taxpayer certain warnings as provided in Manual that he was the subject of a criminal investigation). Although the quoted portion of *Horne* was only dicta in the opinion, we do note that then-Judge Breyer was a member of the *Horne* panel, and we afford deference to his views. Moreover, the Seventh and Eighth Circuits have opined that a taxpayer may challenge a conviction by relying on the Manual's provisions, so long as the taxpayer's challenge was based on an alleged violation of a constitutional right. *See Peters*, 153 F.3d at 451–52 n. 9; *United States v. Grunewald*, 987 F.2d 531, 534 & n. 3 (8th Cir.1993). We approve of these approaches,[3] and we will proceed accordingly.

**B.**

■ IRS regulations explicitly prohibit a revenue agent from developing a criminal case against a taxpayer under the guise of a civil investigation. *See United States v. Powell*, 835 F.2d 1095, 1100 n. 12 (5th Cir.1988) (citing INTERNAL REVENUE MANUAL, § 9311.83(1)[4]). McKee first argues that Agent Loges knew or at least strongly suspected from the outset that McKee had committed criminal tax violations, and only went through the guise of a civil audit to collect evidence for a criminal prosecution against her and her husband. Although McKee voluntarily complied with all of Loges's document and record requests, a "consensual search is unreasonable under the Fourth Amendment or violative of due process under the Fifth Amendment if the consent was induced by fraud, deceit, trickery or misrepresentation by the revenue agent." *Peters*, 153 F.3d at 451; *accord Powell*, 835 F.2d at 1098.

McKee's argument—that her constitutional rights were violated—relies heavily on certain provisions of the Manual, which direct the revenue agent to suspend her civil investigation and turn the matter over to the CID once she has developed a "firm indication of fraud" warranting a criminal investigation. The "firm indication of fraud" rule is located in various provisions of the Manual, including § 4565.21(1), which states:

> If, during an examination, an examiner [i.e., revenue agent] uncovers a potentially fraudulent situation caused by the taxpayer and or the preparer, the examiner shall discuss the case at the earliest

**3.** We note that the Fourth and Ninth Circuits deviate from the above approach by affording little, if any, substantive consideration to the provisions in the Manual. *See Crystal v. United States*, 172 F.3d 1141, 1148 (9th Cir.1999); *Groder*, 816 F.2d at 142.

**4.** The IRS developed this rule as a response to the Fifth Circuit's decision in *United States v. Tweel*, 550 F.2d 297, 300 (5th Cir.1977), which characterized the IRS's practice of conducting civil audits at the bequest of CID investigators as "shocking."

possible convenience with his/her group manager.... Once there is a firm indication of criminal fraud all examination activity shall be suspended.

INTERNAL REVENUE MANUAL § 4565.21(1) (August 1, 1996). The Manual further outlines typical "Badges of Fraud" that the revenue agent can identify during the course of her investigation. Such "Badges of Fraud" include: understatement of income; claiming fictitious or improper deductions; accounting irregularities; improper allocation of income; and suspicious acts or conduct by the taxpayer. *See id.* § 4231 HB 940 (April 23, 1981).

■ We are satisfied that the Manual's rule, requiring suspension of a civil investigation once the revenue agent has a "firm indication of fraud," is the type of rule that is designed to protect the taxpayer's constitutional rights. As the Eighth Circuit cogently explained: "Significantly different rights, responsibilities, and expectations apply to civil audits and criminal tax investigations. It would be a flagrant disregard of individuals' rights to deliberately deceive, or even lull, taxpayers into incriminating themselves during an audit when activities of an obviously criminal nature are under investigation." *Grunewald*, 987 F.2d at 534; *see also Peters*, 153 F.3d at 452 ("if a revenue agent continues to conduct a civil audit after developing 'firm indications of fraud,' a court may justifiably conclude that the agent was in fact conducting a criminal investigation under the auspices of a civil audit"). For these reasons, we agree that compliance with § 4565.21 is mandated by the Constitution. *But see Groder*, 816 F.2d at 142 (classifying § 4565.21 as essentially a procedural

rule conferring "no substantive rights or privileges upon taxpayers").

■ Although we have not had occasion in recent years to address the implication of a taxpayer's Fourth and Fifth Amendment rights during a civil IRS audit, we have done so in the past. This court has noted that "generally an affirmative misrepresentation by an IRS agent that the investigation is routine when in fact it is a criminal investigation requires suppression of evidence." *United States v. Nuth*, 605 F.2d 229, 234 (6th Cir.1979). The *Nuth* court also stated that the evidence will be suppressed only upon a "clear showing that the taxpayer was tricked or deceived." *Id.*; *see also United States v. Allen*, 522 F.2d 1229, 1233 (6th Cir.1975) ("In the absence of a clear showing that the taxpayer has been tricked or deceived by the government agents into providing incriminating information, the documents and statements obtained by the Internal Revenue agents are admissible."); *Marra*, 481 F.2d at 1203. From these precedents, it is incumbent upon McKee to show, by clear and convincing evidence, that (1) Loges made affirmative misrepresentations in the course of her investigation, and (2) because of those misrepresentations, McKee disclosed incriminating evidence to the prejudice of her constitutional rights. McKee can satisfy her burden, as a practical matter, by showing that Loges knowingly failed to comply with the Manual's suspension-of-investigation rules.[5] *Cf. United States v. Wadena*, 152 F.3d 831, 851 (8th Cir.1998), *cert. denied,* — U.S. —, 119 S.Ct. 1355, 143 L.Ed.2d 517 (1999); *accord Tweel*, 550 F.2d at 299.

---

**5.** The test to determine a constitutional violation we announce today is closely related to the three-point test employed by the Eighth Circuit. *See Wadena*, 152 F.3d at 851; *Grunewald*, 987 F.2d at 534. The district court suggested that the Eighth Circuit's test is different from reviewing whether the IRS complied with its own Manual provisions to honor the constitutional rights of taxpayers. *See*

J.A. at 426 n. 9. Any differences are of form, not substance. If the revenue agent continues the civil audit even after she has developed "firm indications of fraud," then she is, in fact, making affirmative misrepresentations to the constitutional detriment of the taxpayer because she is gathering criminal evidence against the taxpayer under the guise of a civil proceeding.

▮ Whether or not Loges had a firm indication of fraud and failed to suspend the civil audit is a question of fact to be reviewed for clear error. *Wadena*, 152 F.3d at 851. Upon review of the record, we cannot afford McKee the relief she seeks.

McKee argues that Loges should have referred the case to the CID immediately, and should never have undertaken the civil investigation at all. McKee contends that Loges had the requisite "firm indication of fraud" on the part of the McKees when she received detailed information from two different Valley Electric employees (one of whom she knew to be a credible informant) alleging the same tax violations. Thus, McKee reasons, Loges's entire civil investigation was a sham, and her true purpose was to gather evidence in hopes of eventually seeking criminal prosecution.

▮ McKee's position leaves us unconvinced. We have no doubt that the IRS receives "tips" alleging tax violations, such as those provided to Loges on a daily basis from disgruntled employees, jilted spouses, or civic-minded citizens. That Loges received information alleging the same tax violations on the part of the McKees from two separate sources is hardly damning because the allegations were not substantiated by documentary evidence, nor any other evidence supporting a conclusion that McKee intended to evade her tax obligations. *See, e.g.*, INTERNAL REVENUE MANUAL § 4565.21(1) ("A firm indication of fraud is more than mere suspicion or first indication of fraud, it is a factual determination which must be made on a case by case basis."); *Peters*, 153 F.3d at 455 ("it is the taxpayer's intent to evade taxes that differentiates a criminal violation from a civil case"). The Manual itself emphasizes the point:

(1) The second basic fact which the Government must prove to establish fraud is that the understatement of tax liability was due to deliberate intent to evade tax. The fact that income was understated does not, standing alone, prove that such understatement was intentional. A failure to report the correct income may be due to mistake, inadvertence, reliance on professional advice, honest difference of opinion, negligence, or carelessness, none of which constitutes the deliberate intent to defraud.

(2) Intent to evade tax occurs when a taxpayer knows that the misrepresentation is false. Intent is a mental process; a state of mind. It is necessary to judge a taxpayer's intent by actions. The things that a person says or does are assumed to be the natural consequences of the person's intention.

INTERNAL REVENUE MANUAL, § 4231 HB 933 (April 23, 1981).

Only the most overzealous revenue agent would have considered referring the McKees' case to the CID as a result of the information provided by Pique and the other source. As several courts have properly recognized, a major function of a civil audit is to allow the taxpayer a chance to explain the discrepancies in his tax reports. *See Peters*, 153 F.3d at 455; *United States v. Caldwell*, 820 F.2d 1395, 1402–03 (5th Cir.1987); *Groder*, 816 F.2d at 143; *United States v. Kaatz*, 705 F.2d 1237, 1243 (10th Cir.1983) (revenue agent need not refer case to CID in face of unanswered questions). While it is conceivable that a revenue agent may be presented with such overwhelming evidence of tax fraud that the only reasonable conclusion is that the taxpayer willfully set out to evade his tax responsibilities, and the case should be submitted to the CID immediately without a inquiry from the Examination Division, McKee's circumstances do not give rise to such an extraordinary situation. Far from disregarding the Manual's provisions, Loges acted in complete conformance with them by contacting the McKees and offering them the chance to account for the improprieties alleged by Pique and the other anonymous source.

▮ In the alternative, McKee contends that Loges should have terminated

her investigation shortly after September 24, 1992–the date of her second interview with Mr. McKee. On or within a few days after that date, Loges was targeting and questioning specific entries in Valley Electric's ledger and asking for documentation to support the entries. Mr. McKee also presented Loges with some records indicating that certain items had been left out of the employee loan account.

 In hindsight, it might have been preferable for Loges to transfer the matter to the CID after September 1992. However, as nearly every court addressing these very issues has observed, courts must defer to the discretion of revenue agents as to whether an initiation of a criminal investigation is warranted. *See Peters*, 153 F.3d at 453 & n. 11 (collecting cases). Loges testified before the magistrate judge that, in her experience, she generally "double check[s]" her work and gives taxpayers under investigation "the benefit of the doubt and any opportunity at all to answer the question" when she uncovers possible tax discrepancies. J.A. at 522. Given the deference that IRS agents must be afforded to carry out their official duties, we cannot say that Loges abused her discretion in continuing the investigation of the McKees and seeking explanations for the discrepancies after September 1992.

We reach this conclusion reluctantly. It is particularly troubling that almost all of the government's evidence against the McKees was practically handed to the CID on a silver platter as a result of the civil investigation. Cases involving similar factual scenarios as the one sub judice are not in short supply. See *Peters; Wadena; Grunewald; Powell; Michaud; Caldwell; Groder; Kaatz; United States v. Piper*, 681 F.Supp. 833 (M.D.Ga.1988). We recognize that revenue agents are not charged with criminal law enforcement. Nevertheless, as this case exemplifies, the reality is that revenue agents sometimes perform the same functions of evidence gathering as their CID counterparts, and

such evidence is often admissible at a criminal trial.

Our nation's tax collection system is based on voluntary compliance. *See Groder*, 816 F.2d at 144; *Tweel*, 550 F.2d at 300. If the IRS's internal operating procedures afford anything less than faithful adherence to constitutional guarantees, then public confidence in the IRS will necessarily be undermined. While we agree that the IRS's "firm indication of fraud" rule comports with the requirements of the Constitution, we do encourage revenue agents to err on the side of protecting taxpayers' constitutional rights when they conduct their investigations.

### C.

McKee's second argument is that Loges failed to comply with the Manual provisions requiring the preparation of a "Form 2797" report, which is the administrative form used to refer an investigation to the CID. After she and her husband had been indicted, McKee requested release of her audit file, which the government produced on February 12, 1998. There was a Form 2797 in the McKees' civil audit file, but it was only prepared with regards to Valley Electric, not the McKees personally. Moreover, the district court found that the Form 2797 report in this case was completed in 26 working days, not 15 as required by the Manual. Nevertheless, the district court determined that the "defendants have not suffered any prejudice as a result of this delay." J.A. at 464.

 The relevant provision of the Manual reads as follows:

If, during an examination, an examiner discovers a firm indication of fraud on the part of the taxpayer, the tax return preparer, or anyone aiding in preparing of supporting documents, the examiner shall suspend further examination activities at the earliest opportunity without disclosing to the taxpayer, the taxpayer's representative, or employees, the reason for such suspension. The find-

ings should be discussed with the group manager and the DFC, in order to make a decision as to whether or not the facts warrant a criminal fraud referral. *You should report your findings by preparing Form 2797 (Referral Report of Potential Criminal Fraud Cases) and submitting your findings through your group manager. The purpose of the referral is to enable the C1 to evaluate the criminal potential of the case and decide whether a fraud investigation should be undertaken. Accordingly, it is important that your Form 2797 referral report contain sufficient information to enable C1 to make an evaluation.* INTERNAL REVENUE MANUAL, HB 4350, Part IV (June 27, 1996) (emphasis added; parenthetical in original); *see also id.* at § 4565.21 ("Preparing Referral Report"). As far as we can tell-and McKee proffers no argument suggesting otherwise—the sole function of a Form 2797 report is to ensure a smooth transition from the Examination Division to the CID once a revenue agent believes that a referral is appropriate. Thus, the provisions of the Manual pertaining to Form 2797 are purely "administrative," and were not promulgated for the benefit of the taxpayer. *See Mapp,* 561 F.2d at 690; *Lockyer,* 448 F.2d at 420–21.

 We are not persuaded by McKee's bald and conclusory assertions that compliance with the provisions related to Form 2797 is "required to protect the citizen's constitutional rights against self-incrimination and right to counsel." McKee Br. at 25. Once the revenue agent has suspended her investigation, the taxpayer's Fourth and Fifth Amendment rights are suffi-

ciently honored. Whether or not the revenue agent completes the necessary paperwork as set forth in the Manual simply does not implicate the taxpayer's constitutional rights.[6]

## IV.

For the reasons stated herein, McKee's conviction is **AFFIRMED.**

DAVID A. NELSON, Circuit Judge, concurring.

Because we conclude that Agent Loges was not shown to have violated the *Internal Revenue Manual* in failing to turn the investigation over to the Criminal Investigation Division sooner than she did, I am not sure that we need to express an opinion as to what the constitutional implications would have been had we concluded that Agent Loges did violate the manual. Other circuits seem to approach the constitutional question in a variety of ways, and I am inclined to think it would be preferable for us to wait for a case where the manual has actually been violated before we decide what our approach should be in such a case. While I concur in the court's judgment and in most of Judge Jones' opinion, therefore, I do not join in the endorsement of the manual-violation rule followed in certain of our sister circuits. I do not mean to suggest that I think the rule is wrong; I simply see no reason for us to decide the question at this juncture.

---

6. McKee relies on *United States v. Weiss,* 566 F.Supp. 1452 (C.D.Cal.1983), which appears to be the only instance of a court dismissing a criminal indictment because of the government's failure to complete the Form 2797 per the Manual's provisions. Even disregarding the questionable issue of whether *Weiss* court correctly determined that compliance with those provisions was mandated by the Constitution, *Weiss* is distinguishable because the court's finding—that the IRS had engaged in "institutional bad faith"—was based on several governmental irregularities, including the improper utilization of civil summons to further an investigation wholly criminal in nature. *Id.* at 1453–55. Moreover, at least one circuit court has rejected the contention that an allegedly deficient Form 2797 mandates reversal of a conviction, which is essentially the argument McKee presents to us here. *See United States v. Michaud,* 925 F.2d 37, 42–43 (1st Cir.1991).